**WILLIAMS, et al v. SOUTHERN IRON & METAL CO.**

Industrial Commission.

May 25, 1955.

Norman Freedman, Jacksonville, for Doretha Williams.

Ernest J. Jacobs, Jacksonville, for Hattie Williams.

Samuel Kassewitz, Jacksonville, for the employer and insurance carrier.

JAMES T. VOCELLE, Chairman and WALTER L. LIGHTSEY, Commissioner.

This cause came on to be heard on the carrier's application for review of a deputy commissioner's order dated August 3, 1954. The sole question is one of attorney fees. The deputy found that the deceased employee was survived by a widow and three children (one a step-child). Pursuant to said findings, the deputy ordered the carrier to pay the widow $12.88 per week (35% of the deceased's average weekly wage of $36.80) and $3.07 per week to each of the children (8 1/3% of said average weekly wage). The carrier applies for review of that portion of the order requiring payment of attorney fees by the carrier.

The deceased was injured in an explosion in the course of his employment on December 11, 1953 and died the same day. Confronted (as the carrier states in its brief) with the several claims and one by an alleged dependent mother, it wrote to the commission 12 days later on December 23, 1953 "that it was willing to pay compensation" but that "it will be necessary for the commission to determine the proper beneficiaries to receive payment of compensation." Hearings to determine the above claims were held on May 14, 1954 and June 7, 1954.

Legislative policy with respect to attorney fees in workmen's compensation cases varies in the several states. Florida is one of

the few which charges the carrier under certain circumstances set forth in the Act. Our legislature has determined and incorporated its policy in section 440.34(1), Florida Statutes 1953, as follows—

> If the employer or carrier shall file notice of controversy as provided in §440.20 of this chapter, *or* shall decline to pay a claim on or before the twenty-first day after they have notice of same, *or* shall otherwise resist unsuccessfully the payment of compensation, and the injured person shall have employed an attorney at law in the successful prosecution of his claim, there *shall*, in addition to the award for compensation be awarded reasonable attorneys fee . . . (Italics added.)

Under this section, there are three classifications, any one of which makes *mandatory* the payment of an attorney fee. "There *shall* . . . . be awarded reasonable attorneys fee" if—(1) the carrier controverts the claim, or (2) it declines to pay a claim on or before the twenty-first day after it has notice, or (3) otherwise resists unsuccessfully the payment of compensation. In the case now before us, there is no evidence that the carrier took any steps to resist the claims. Accordingly, we eliminate (3) as a basis for ordering payment of an attorney fee. It further appears that the carrier never controverted the above claims. It follows that classification (1) does not support the order of payment. It is, however, undisputed that the carrier declined to pay these claims on or before the twenty-first day after it had notice; it is undisputed that the claimants "employed an attorney at law in the successful prosecution of [their] claims." We are therefore of the opinion that classification (2) and the mandatory provisions of the section support the deputy's order requiring the carrier to pay attorney fees.

The carrier contends that the imposition of the charge for attorney fees is inequitable where there are conflicting claims among several survivors; that the existence of such conflict made it necessary to hold a hearing to resolve which of the claimants were entitled to benefits under the Act. We are fully aware that the existence of conflicting claims in death cases poses a difficult administrative problem for the carrier. It is understandable that in order to reduce the risk of improper payment ordinary business prudence may well at times dictate that the carrier withhold making any payments until the claims have been adjudicated. When, however, a hearing has been held and such adjudication made, there still remains the question as to the burden of paying the attorney fees. The successful claimant, on the other hand, contends that it is inequitable that his statutory benefits be consumed

by payment of fees to an attorney whose services were forced on him to obtain that to which he was *in fact* entitled under the express provisions of the Act; that it is contrary to the purposes and provisions of the Act that the burden of the fees should fall on him when he is as little responsible as the carrier for the existence of other claims adverse to his own. These opposite points of view find support in the varied legislation of the several states. It is not for this commission to choose between these conflicting policies. The choice has been made by our legislature in section 440.34, quoted above.

In Fidelity & Casualty Co. v. Bedingfield, 60 So. 2d 493, our Supreme Court said—"There can be no question that the acceptance of the workmen's compensation law by the employee, employer and insurance carrier constitutes a contract between the parties which embraces all of the provisions of the law as they exist at the time the employee sustains an injury." Part of that contract is the provision that if the employer or carrier—". . . . shall decline to pay a claim on or before the twenty-first day after they have notice of same . . . and the injured person shall have employed an attorney at law in the successful prosecution of his claim, there shall, in addition to the award for compensation be awarded reasonable attorneys fee . . . ." We can find nothing in that contract to indicate that in difficult cases the burden shall shift from the carrier to a successful claimant.

There remains for consideration one further argument by the carrier. In substance, it construes sections 440.16 (2) (c) and 440.16 (5) to mean this—where there are two or more survivors of the deceased employee, no *rights* to benefits arise until a hearing has been held and an adjudication made by the deputy. Section 440.16 (2) (c) reads in part as follows—

. . . . provided, however, where the deceased is survived by a widow or widower and also a child or children, whether such child or children be the product of the union existing at the time of death or of a former marriage or marriages, *the commission may provide for the payment of compensation in such manner as to it may appear just and proper and for the best interests of the respective parties and in so doing may provide for the entire compensation to be paid exclusively to the child or children.* (Italics added.)

Section 440.16 (5) reads as follows—

If the commission determines that payments in accordance with clause (b) of subsection (4) would provide no substantial benefit to any person of such class, *it may provide for the payment of such compensation to*

*the person or persons within such class whom it considers will be most benefited by such payment.* (Italics added.)

Quoting from the carrier's brief—

> The case presently before the commission is a fine example of why the employer or carrier cannot undertake to make payment, in any proportion, to the dependents of the deceased claimant until such time as the commission shall determine which dependents are entitled to compensation, and to what amount of compensation they are entitled. In the instant case the deceased claimant was survived by a wife, a mother, two apparently legitimate children and one step-child. How can the carrier undertake to pay compensation to the widow in the amount of 35% of the average weekly wage of the deceased claimant and then undertake to pay the balance of 25% of the weekly wage in equal amounts to each of the three children? The case may well be one where it may not appear to be just and proper and for the best interests of the respective parties to pay to the widow any benefits, particularly when the widow stated that she and the deceased employee had been separated for over two years, and all the benefits should be paid to the three children. On the other hand, it may be a case in which it would appear to be just and proper that the widow receive 35% of the average weekly wage but that the remaining 8 1/3% for each of the three children would not provide substantial benefit for any one of the children and the entire remaining benefits should be paid to one of the children. These are matters which must be decided by the commission and are matters which cannot arbitrarily be decided by the employer or carrier. The Act places upon the commission the duty of establishing the benefits payable to the respective dependents for the best interests of the several dependents. Thus, it is the duty of the commission to make its investigation and determine which of the survivors are entitled to what proportion of the benefits payable. The Act specifically lodges in the commission the discretion to make this determination thereby taking from the carrier or employer the right to make the determination.

We find no merit in this argument. The essential feature of the Florida workmen's compensation law is its self-executing framework. Unlike those states which require an administrative hearing in every compensation case, benefits are intended under our Act to pass directly from the carrier to the beneficiary. The character of the Florida Act is embodied in section 440.20 (1)—"Compensation . . . . shall be paid . . . . promptly . . . . and directly to the person *entitled* thereto, *without an award,* except where liability to pay compensation is controverted by the employer." Section 440.02 (11) defines compensation as—". . . . the money allowance payable to an employee *or to his dependents as provided for in this chapter.*" (Italics added.)

The benefits "to his dependents as provided in this chapter," are covered by section 440.16 (2). Under the latter section, *"the*

*employer shall pay"* a stated percentage of the average weekly wage to the widow and a stated percentage to the children. The rights of the survivors are definite and arise upon the death of the employee. The commission has but a discretionary power to alter the statutory allocation of benefits on its own motion or upon application of an interested party. The deputy commissioner was correct when he stated that—"this can only mean that the employer or carrier may pay in accordance with the provisions of section 440.16(2) (a) and (c), and then after payments have been commenced, the commission or some interested party, feeling that such percentages are not just and proper, asks that consideration be given to changing them. In the instant case, had the carrier paid in accordance with 440.16(2) (a) and (c), it would have been entitled to credit for such payments even if thereafter the commission by its order required payment in a different ratio. Section 440.16 obviously does not intend to compel the commission to enter an order in each and every death case, directing to whom compensation should be paid. If the carrier's contention with respect to this section is correct, then death benefits could never be paid except after an order by the commission."

The carrier cites Balatsos v. Nebraska Ave. Cafe & Liquor Store (Fla.), 30 So. 2d 633, as authority for its position. There is considerable difference in the facts. In the case now before us the carrier on December 23, 1953, 12 days after the death of the employee, referred the matter to the industrial commission, ostensibly relieving itself of further labor and expense of investigation. No benefits were received by the widow and children until some time after the order of the deputy was entered on August 3, 1954—over 8 months after the death of the employee. It appears from the Balatsos opinion, however, that the carrier in that case was not only still in the process of investigating the claim, but, as a matter of fact, an advance in excess of the deceased husband's salary had been made to the surviving widow.

Cited also by the carrier is the commission order in Hayes v. Wilson, claim #P-16821. Upon consideration of the issue before us, we conclude that the Hayes order failed to properly apply the attorney fee section of the Act (section 440.34) and incorrectly states the applicable law. It is, accordingly, by this opinion overruled.

It is the opinion of a majority of the commission that the order of the deputy commissioner requiring the carrier to pay attorney fees was proper and that the amount allowed was reasonable. The deputy's order is affirmed and it is ordered that the carrier pay

to each of the attorneys for the claimants the sum of $300 as a reasonable attorney's fee for representing the claimants before the commission in this cause.

JAMES CAMERON, Commissioner (dissenting).

In the award appealed from, the deputy commissioner found that all the claimants were dependents of the deceased employee. He divided up the compensation among four of the five claimants and assessed attorneys' fees totaling $900 against the carrier. He found that the widow had left the deceased for a good cause. It is interesting to note that the majority opinion neglects to mention the fact that the deputy also found that the mother of the deceased was a dependent.

The only question involved in this appeal is whether the carrier, under the peculiar set of circumstances in this case, as a matter of law, *declined* to pay a claim on or before the twenty-first day after it had notice of same—so as to obligate itself to pay the claimants' attorneys under section 440.34(1) of the Act. In order to decide that question it is necessary to consider the factual situation involved.

The deceased employee, Arthur Williams, died on December 13, 1953 as the result of an injury arising out of and in the course of his employment. The claimants were his mother, Hattie Haywood, on behalf of herself and his minor child, Audrey, and his estranged wife, Doretha, on behalf of herself, her own child, James, and a child alleged to be that of the deceased, Sonja. Only Hattie and Audrey were actually dependent on the deceased at the time of his death.

Doretha's statement, taken by the carrier two days after Arthur's death, states that she had a son, James, born in 1947. She met Arthur several years later. They had a daughter, Audrey, in 1950, and in 1951 they were married. They separated in October of 1951 and Arthur supported Audrey who had been living with his mother, Hattie Haywood, since they had separated. No mention of Sonja was made in Doretha's statement.

Within ten days after Arthur's death, the claimants had all retained counsel and the carrier had written the commission that it was "ready and willing" to pay compensation and requested an investigation by the commission to determine the proper beneficiaries to receive compensation. A week later the commission replied, stating that the responsibility of investigating was the carrier's and requesting that the carrier—"investigate the case and submit

all information concerning the known dependents in order that we may submit the file to the deputy commissioner for the purpose of determining the order of preference and to provide for the payment of compensation in such manner as to him may appear just and proper and for the best interests of the respective parties."

Simple arithmetic will show that the carrier could—(1) request the commission to designate the percentages to pay the various claimants, (2) pay compensation in a total amount of 105 percent, or (3) attempt to guess what preference the deputy would give which claimants and pay those claimants at its peril.

Under section 440.16, subsection (2) (c), questions of fact are for the determination of the deputy commissioner—and he has chosen to believe the widow, Doretha. But his finding that Doretha left Arthur for just cause rests solely on her testimony. There is considerable contradictory evidence in the record and he could have just as easily determined that the majority of the compensation be paid to Audrey and the deceased's mother, who were the only claimants actually dependent upon the deceased.

For example, Doretha testified that she returned to Arthur for one weekend in January of 1952 at which time Sonja, her third child was conceived. In contradiction to this is her written statement to the carrier that she and Arthur had *one* child, Audrey. Also there is the testimony of the deceased's sister that Doretha told the sister she was never able to see Arthur when she came to Jacksonville. It seems odd that she would visit Arthur for a weekend without visiting her child Audrey, and there is Hattie's testimony that Doretha never came back to visit Audrey prior to Arthur's death.

Doretha testified that she and Arthur were happy for a few weeks after they were married, but then he began to come home late, curse her, slap her, and to whip James, her son, unnecessarily. In contradiction to this testimony is that of the couple with whom they boarded for the first four months after they were married to the effect that the deceased was good to his wife, never struck her, never cursed her, and was nice to her son.

Doretha testified that she left Arthur the weekend during which Sonja was supposed to have been conceived because, "He forced an unnatural sex act on me." Her language is unusual compared to the rest of her testimony, but an objection was sustained to a question regarding the precise nature of the act involved.

Doretha repeatedly stated that she "had never had any boy friends" since she left Arthur in October of 1951, but that after

she left Jacksonville and moved to Lakeland, her social activities consisted of going to the movies and to some club, the nature of which was not described. However, witnesses produced by the attorney for the deceased's mother testified that on May 17, 1954, at about 10:30 P.M., they observed Doretha and a man, who was apparently spending the evening in her house, sitting on a bed and arguing. Through the window they could see that he was stripped to the waist. Further observation was curtailed by the shades being pulled and the lights turned down.

Doretha explained the fact that a certified copy of the birth certificate of Sonja showed that the space for the father's name had been left blank by saying that the midwife registered the birth and that she did not tell the midwife what to say. However, the birth certificate lists the informant as Doretha Williams, and not the midwife.

There is no question that the carrier was obligated to pay compensation. Audrey was unquestionably the deceased's child, and he admittedly supported her. Apparently he also contributed to Hattie's support. But from the very beginning there was a fight between Doretha, who left the child with Arthur in 1951, and Hattie, who actually took care of the child, as to who was the proper person to receive compensation for the use and benefit of the child. The deputy very wisely determined that it should go to Hattie, who testified at one point—"I know one thing, I had the little baby, because it didn't have no one to care for it, and I still would love to keep it if I could." But is the carrier to be held responsible for guessing the decision of the deputy on a matter that is wholly discretionary?

The decision of the majority of the full commission gives the carrier several alternatives. It can pay compensation in a total of 105 percent and avoid paying an attorney's fee. It can gaze into a crystal ball and predict how the deputy will determine preference and whom the deputy will find the proper person to receive compensation for the minor children. If the ball is cloudy, the carrier will be assessed an attorney's fee and also be out the compensation paid to the dependent whom the deputy did not award compensation. For example, although the deputy here found that Hattie was a dependent, the compensation was divided among Doretha, James, Audrey, and Sonja.

In this case the deputy ordered the carrier to pay an attorney's fee assessed on the same basis as if the carrier had denied liability for the accident or had controverted the dependency of any and

all claimants. Yet it is difficult to visualize a set of facts which would more strongly indicate that the commission should make an investigation as provided in section 440.25(3)(a)—in the event that section 440.20(8) is in fact to be technically limited as stated in the deputy's opinion. If this decision is followed, it will materially increase the number of controverted death cases because carriers will automatically contest all death cases in which the number of claimants would run the percentage of compensation over 60 percent of the deceased's average weekly wage. If a full attorney's fee is to be assessed where the carrier is not contesting the accident nor the dependency but is faced with so many dependents that it must ask the commission whom to pay, then the carrier would have nothing to lose by contesting the whole claim. The added burden on the deputy commissioners will be considerable.

The majority opinion assumes that if the carrier had paid compensation to Doretha and Sonja, the child of the alleged weekend interval, it would have received credit in the event the commission changed percentages. The basis for this assumption is non-existent. In fact, had the writer tried the case, the writer would have found that Doretha failed to show that she was living apart for sufficient cause or that Sonja was the child of the deceased.

The majority of the commission has in effect held that as used in section 440.34(1) the word, "fail" and the word, "decline" are synonymous. The majority opinion freely supplies emphasis to its quotation of the statute but neglects to consider the meaning of the word "decline." Rather than being "undisputed that the carrier declined to pay," as stated in the majority opinion, whether or not the carrier "declined" is the very essence of this dispute. Webster in defining "decline" at no point uses the expression "fail." As synonyms it gives the words, "repudiate and repel." "Decline" and "refuse" express "the opposite of consent; decline is the more courteous term; refuse is more positive often implying decided, even pugnacious, rejection of what is offered." It is thus obvious that *failing* to pay is not in and of itself *declining* to pay. Rather, in each case where there is a failure to pay, the facts in the particular case must be considered to determine whether *as a matter of law* the carrier declined to pay as contemplated in section 440.34(1) of the Act. If the legislature had intended that every failure to pay a claim within twenty-one days after a carrier has notice thereof should obligate the carrier to pay an attorney's fee, regardless of the circumstances, it would have been extremely simple to use the word "fail" rather than the word "decline" in the statute.

The Florida Supreme Court has already ruled that an attorney's fee is not to be assessed against the carrier on a simple failure to pay within the twenty-one day period, in Balatsos v. Nebraska Avenue Cafe & Liquor Store, 30 So. 2d 633, decided in 1947. There the widow's claim was filed December 18, 1945, and the award of the deputy entered February 28, 1946, making the attorney's fee a lien on compensation. The full commission reversed the deputy stating that, "No compensation was paid by the carrier, although they stated they were willing to pay compensation," and assessing the attorney's fee against the carrier. The circuit court reversed the full commission, stating that the carrier had frankly admitted liability but had averred difficulty in getting the facts. The circuit court opinion, however, leaned heavily on the fact that the widow had received an advance from the employer. (It is interesting to note that the majority opinion in the instant case fails to mention the fact that this advance was made by the *employer*, not the *carrier*.) The Supreme Court affirmed the circuit court, but it went further than mere reliance on the advance paid by the employer, holding that—

> Nowhere in the record does it appear that the carrier denied liability. The differential of time between the notice of the claim and the first hearing was being used by the carrier to make needful investigations of such claim . . . The question is: Should the attorneys' fees under the circumstances, be assessed against the carrier . . . We feel that a carrier has a reasonable time to investigate a claim; no penalty should be imposed on the carrier for reasonably investigating a claim; the time for such investigation must always be relevant. *The carrier has never denied liability nor declined payment.* (Italics added.)

The question of the meaning of the word "decline" was brought before the Supreme Court in the brief of the carrier which argued that—"The carrier insists that the word, 'decline' as used in the statute means a refusal to pay and not a mere failure to pay, and that to refuse to pay carries with it a knowledge of the facts sufficient for it to make a reasonable decision." The briefs filed by both parties in this case indicate that the weight of authority in other jurisdictions sustains assessing the attorney's fee against the claimant in cases of this nature.

The Balatsos case was followed by the full commission in claim #P-16821, Hayes v. Wilson, where the attorney's fee was assessed against the claimant widow.

It has been argued that the carrier is in the business of insurance and should pay the attorney's fee in order to be protected by an order designating the proper claimant in death cases, adjusting its premiums accordingly, that it assumes the risk that the claimant

may be killed and that it will have to pay compensation to his dependents. To require it to assume the risk of having to pay a large attorney's fee because a deceased had several widows, or several sets of children, or, as in the instant case, five dependents whose compensation would total 105 percent, would force it to pay for a risk which was unanticipated when the insurance policy was written; and to require a carrier to collect premiums for the purpose of straightening out a decedent's marital mixups is going completely outside of the purpose and intent of the workmen's compensation law.

If the Act is to be changed and section 440.34(1) amended to substitute the word "fail" for the word "decline," it should be done by the legislature and not by the court. In this case, the carrier did not controvert the accident, nor did it controvert dependency—it was ready to pay 60 percent of the average weekly wage. The fight was between the claimants. In fact, a good part of the first hearing was taken up with an argument between counsel for the grandmother and counsel for the mother as to which one represented the daughter, Audrey.

There have always been cases where the attorney's fee is a lien on compensation. The record here shows that the claimants employed counsel even before the carrier requested the commission to designate the proper percentages for the dependents. They should certainly receive a fee for their services, but there is no logical or statutory basis for assessing that fee against the carrier.